The next case this morning is 523-0474, People v. Sanders. Arguing for the appellant is Jack Axelrude. Arguing for the appellee is Justin Nicolosi. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note, only the clerk of the court is permitted to record these proceedings today. Morning, counsel. Good morning. Appellant, if you are ready to proceed, you may do so. Thank you, your honor. And may it please the court, counsel. Good morning. Again, my name is Jack Axelrude, and I'm here on behalf of Mr. Michael Sanders. In his briefs, Mr. Sanders raised three issues. I will spend my time on the first issue, but I can answer any questions on the second and third. Getting right into the main issue, which was, the state's evidence was insufficient to prove Mr. Sanders was involved or responsible for the shooting beyond a reasonable doubt. This case hinged entirely on the single eyewitness identification of the shooters from Mr. Eldridge Robinson, the person that was shot at. However, his identification was unreliable, where it occurred in a split second from about 175 feet away in a poorly lit neighborhood while gunshots were being fired in his direction. This identification is exactly what the factors for evaluating the likelihood of misidentification from Neil v. Biggers were meant to prevent. The first Biggers factor, the witness's opportunity to view the offender at the time of the crime, is the most important for the analysis because a witness cannot make an identification without a full and adequate opportunity to observe the suspect. Without an opportunity to see the shooters, the rest of the factors are insignificant. Here, Mr. Robinson's opportunity to observe the shooters was incredibly brief and remote and occurred under difficult visual conditions. Mr. Robinson had been at Mr. Sanders' home 15 minutes prior to the shooting and had seen four men, including Mr. Sanders. All four men were armed and Mr. Sanders told Robinson to come back in like 15 minutes because he was worried about another person who Sanders had been speaking to on the phone who had been threatening to come and shoot up Mr. Sanders' home. A key point here is that if Mr. Sanders wanted to kill Mr. Robinson, he could have just had it done when he was there originally as everybody already had their guns and already had their guns handy and were on alert. Instead, when Mr. Robinson was on his way back 15 minutes later, he got to the corner of Gleason and Sherrill, which was down the block from Sanders' home. This intersection was where Mr. Robinson's identification took place. The defense's investigator, Steve Gess, provided important evidence of this scene. Beyond testifying to the dark conditions and lack of outdoor lighting of the neighborhood, Gess measured that this intersection was roughly 175 feet from the driveway. Similarly, the defense also provided testimony from Mr. Sanders' neighbor, Jeff Warner, who lived across the street from Sanders. Warner, an unbiased witness who was positioned closer to the shooters than Mr. Robinson, testified that when he heard the gunshots, he looked out his window just after, but he could not see any details of the people outside because it was so dark out and the outdoor lighting was so poor. Despite these facts, Mr. Robinson claimed he was able to see in the darkness from over 150 feet or more away while driving and was able to explicitly identify Mr. Sanders as one of the men standing in the driveway as the shots were fired in Robinson's direction. His identification is further undermined by how quickly it occurred. Mr. Robinson testified that he was getting ready to turn onto Sherrill Drive at the intersection when the gunshots started. This caused Robinson to negate his turn and instead continue driving straight down Gleason directly to the police station. This means that Robinson's vehicle never fully turned down Sherrill, which shows how quickly this all occurred, and also shows that his headlights never illuminated or added any light to the scene to where the shooters were. As a result, Mr. Robinson only had mere seconds from over 150 feet away in this poorly lit neighborhood while these gunshots were being fired in his direction to see identifiable features of the three shooters. The science of eyewitness identifications, along with just common sense, indicates that a reliable identification in these circumstances would be pretty much, if not completely, impossible. Indeed, the jury clearly did not find Mr. Robinson to be fully credible because it found, despite Robinson's direct testimony otherwise, that it was not proven that Mr. Sanders personally discharged a firearm. Instead, it is very likely that Robinson thought that Mr. Sanders was one of the shooters based on assumptions and not his own perceptions. In its response, the state doesn't really dispute that an eyewitness identification under these circumstances would be difficult had it been a stranger. Instead, the state emphasizes Robinson's prior familiarity with Sanders to argue the identification was reliable. And yes, I do believe the prior familiarity is relevant and important here because it helps explain how this misidentification occurred. It adds to the fact that he assumed Mr. Sanders was involved because he had just seen him 15 minutes prior and because they had this whole complicated history. When he was asked how he knew Mr. Sanders was one of the men that had been shooting at him, Robinson just said he knew because he had just talked to him. It was not based on an actual identification or any sort of visual clues, what he was wearing, anything like that. Beyond that, eyewitness identifications must be analyzed under the factors from VIGARS to prevent a misidentification. Prior familiarity is not one of these factors. As explained in the case we cited to as additional authority, People v. Johnson, which was a recent decision, prior familiarity is not sufficient to demonstrate a reliable identification and it does not supersede the factors from VIGARS. The identification must be based on what the witness actually saw, not what could have occurred based on their previous interactions. Instead, with such a brief and remote opportunity to see the shooters, Robinson's prior familiarity with Sanders, especially since he had just been there 15 minutes at Sanders' home 15 minutes earlier, shows that he inferred rather than positively identified that Sanders was one of the people in the driveway when the shooting occurred. Without a sufficient opportunity to observe the shooters, Robinson's identification was unreliable. And without Robinson's eyewitness identification, the state did not have evidence to show that Sanders was involved or responsible for the shooting. And there is a reasonable explanation as to how this identification could have been wrong that would still line up with the rest of the evidence. Robinson, when he first showed up, had seen four men. When he returned 15 minutes later, he said that he only saw three. Robinson claimed that he could identify the men and that he knew the one man that remained in the house for the entire shooting was Mr. Davis. However, Mr. Davis was the only person that was actually tied to the shooting through the .40 caliber bullets and shell casings that were recovered. This fact undermines Mr. Robinson's credibility and demonstrates that it's just as likely he assumed that Mr. Sanders was Mr. Davis and switched the two up. Again, and this is when asked how he knew Mr. Sanders was one of the men, he said he just knew because he had just talked to him. This is not based off of his perception, off of visual clues, but because he had just talked to him 15 minutes earlier and he was at his home and he knows that he has this history. And so in this instance, instead, the natural inference is that Mr. Sanders, just as he was when Robinson showed up the first time, was the one inside of his own home still still dealing with this other threatening situation. Similarly, Mr. Davis could have been outside, you know, was probably was. So in that instance, Mr. Davis must have been outside with the other men. He was the one that was actually tied to the shooting through ballistics evidence. And notably, his car was parked in the driveway for even more reason for him to have been out there. In this scenario, there would be no evidence to indicate that Mr. Sanders was present in the driveway for the shooting, nor that he ever ordered these men to shoot Mr. Robinson. The phone evidence helps support. What do you have to say about the identification and the second shooting that was introduced? So, yes, so the second shooting, evidence of the second shooting, it was not evidence to show that Mr. Sanders actually committed a crime. It was only introduced for the limited purpose of intent. So it cannot be used to bolster his identification from the first shooting. But beyond that, the second shooting, there's there's numerous issues with the evidence from the second shooting, primarily that Mr. Robinson said he reported the incident to police directly after and said, I could not see who was shooting at me. But I think but I assume it was Mr. Sanders because, you know, he spoke with the police a few months later, said the same thing. It wasn't until nine months later that he said, oh, no, Mr. Sanders was, in fact, the shooter. I saw him leaning out of the car with a big chrome revolver that he fired at me. However, there were shell casings recovered, which revolvers don't eject shell casings. And there were 40 caliber shell casings that were tied to the same 40 caliber shell casings from the first shooting. So just for all these reasons, if anything, the second shooting that just further undermines Mr. Robinson's reliability as an eyewitness, which obviously the jury agreed to some extent. And regardless, the second shooting does not bolster his identification from the first. And if anything, it just further undermines his credibility. Excuse me. The reason I ask is the 40 caliber bullets, the second shooting were tied to the first shooting at his home. So the ballistics match. Well, the ballistics match from the two shootings. But those specific that that specific ballistics evidence was only ever tied to Mr. Davis, the one that Mr. Robinson said was at the second shooting, but explicitly said wasn't at the first. For all these reasons, I think it. The point of the second shooting was only for motive and intent. And if we look at the motive and intent for the second shooting, it's the same that they argued for the first shooting that it was financial. It was based on this relationship that he is with Mr. Sanders, his ex-wife. But the fact that the idea that he wanted to have these men kill Mr. Robinson for him is refuted by the fact that he does not did not just order these men to shoot him when he showed up the first time, despite them all being armed and on guard. He was not Mr. Sanders was not acting hostile or otherwise aggressive with Mr. Robinson. In fact, he told Mr. Robinson, hey, we're dealing with some threats of violence. It's not safe to be here right now. Come back later. And this would also explain why they opened fire from so far away. They did so preemptively because they thought it was a threatening third party, you know, that was coming to follow up on their threats. Instead, nobody intended to kill Mr.  Robinson. Thank you. Thank you. Yes. Thank you. Any questions, Justice Welch? Questions. All right. Thank you, counsel. I believe you may proceed. Thank you, your honors. Good morning. May it please the court and counsel. My name is Justin Nicolosi. I represent the state of Illinois in this case. Just like Mr. Axelrude limited his comments to the first issue. I will do the same. If there are any questions regarding two and three, I'd be happy to answer those. The state submits that any rational trial act could have convicted the defendant of murder. The other charges in this case. The evidence. Responding to the last point that Mr. Axelrude just made, that there was no evidence to kill Mr. Robinson. The state pretty strongly disagrees with that. Of course, that was the entire November 29th shooting. It is to establish that these other men had the intent to kill Mr. Robinson on October 18th, a month or so earlier. The fact that there were two shootings that were tied based on ballistics evidence and the fact that Robinson saw a defendant in the car, establishes that there is a pattern here of the defendant attempting to shoot Mr.  The evidence was and certainly establishes an intent. This case of what was happening on October 18th. The state submits that again, that the familiarity as Mr. Axelrude admitted. It's still an important consideration in this case, regardless of what Johnson says about it. This case is different than Johnson. Because, of course, Eldridge Robinson, 15 minutes before the shooting on October 18th, he went to the defendant's house. Just like he had talked to the defendant that he was going to do. Got out of his car. He walked up to the house. Talked to Rory Nelson. He wanted defendant to come out of the house. Defendant did come out of the house. Defendant said he was in another situation on the phone. And he told Eldridge Robinson to act in 15 minutes. So Robinson left. Came back. I believe Robinson actually testified it was less than 15 minutes later. He came back. And then he saw the defendant. He saw William Gray fired him first. And then the defendant and Rory Nelson fired at him just after. He was asked how do you know that that was the defendant. He said I just saw him. That's how I know. State submits, as I argued in my brief, this doesn't fit perfectly within the factors of Biggers. There was no lineup. There was no show up. There was no having given physical descriptors or clothing descriptors or anything like that of people that he saw shooting him. This case is different because less than 15 minutes earlier, Robinson was face-to-face with these men. He saw them. He saw what they looked like. And, of course, he knew the defendant, whether he knew him from 2018 or from 1990 or whatever. He knew the defendant, went to Vegas with the defendant, was friends with him. He even testified, quote, I love Mike, is what Robinson said. He knew this man. He just saw him less than 15 minutes earlier. And he came back and he said the men that were out there when he came back were there before. You know, this wasn't certainly different than Johnson or all kinds of problems with the eyewitnesses in Johnson that weren't present with Robinson. Again, nobody in Johnson testified that they said they saw the shooter 15 minutes earlier. Again, there was no – the level of familiarity that Robinson had with the defendant was different than any of the witnesses in Johnson. And the one witness in Johnson who said that he was familiar, that his name was Nixon, was familiar with Johnson. He had been drinking a lot. He was focused on the gun. He recanted his testimony at trial anyway. The state submits that, you know, the law is fact specific. The facts of this case are much different than in Johnson. The review of that case would show. The state submits that the fact that the defense investigator went there a year later and took videos and pictures and testified that Robinson could not have gotten a good view of what was happening. The state submits that the conditions on October 18th of 2022, a year later, were much different as the court took judicial notice of the fact that the moon provided considerably more light in 2021 than it did in 2022. And as the investigator acknowledged upon questioning, he did not even go the same direction in the vehicle with the headlights as Robinson did a year earlier. The defense's investigation is just unreliable. It should not be persuaded. Persuasive on this court is obviously the jury. For all the evidence considered, Robinson's testimony, the investigator, and all this other evidence in play, and found the defendant guilty. This is not a retrial. We can't rehash every item here. The jury was in the best position to hear the evidence. The jury, of course, knew of the inconsistencies that Robinson had. His testimony was not perfect. The jury knew that. Consider the fact that the defendant was out face-to-face with the defendant less than 15 minutes before the shooting. Certainly consider that as strong evidence that he returned less than 15 minutes later and people were out there, including the defendant. Robinson testified in no uncertain terms that it was the defendant that was one of the shooters. Again, the defendant clearly had the intent, based on the fact that people were shooting at Robinson and the November 29th shooting. It's significant evidence of intent. And we have the cell phone data. The state submits that any rational try or effect based on the evidence presented would have found the defendant was responsible for the shooting. And the state submits that. Are there any other questions? I'm happy to answer them. Justice Gates, any further questions? No. Justice Walsh? All right. Rebuttal. Thank you, Your Honor. I want to first address the idea of prior familiarity. I think it's important for this analysis. Prior familiarity does not supersede, it does not replace the factors from biggers that are meant to determine whether, you know, the likelihood of a misidentification. The case we cited to Johnson directly applies here. It's the same principle that prior familiarity does not supersede the factors from biggers. In Johnson, there were multiple eyewitness identifications from people that, you know, two or three knew Mr. Johnson in that case, and the court there said they didn't have an opportunity to have observed the shooter. So the fact that they knew him beforehand, it doesn't matter. In this instance, him seeing him 15 minutes earlier, that still just falls under the umbrella of their prior familiarity. And it doesn't do anything to alleviate the evidence of a misidentification from the biggers factors. Which, when we look at it, you know, the lighting, the moon, you know, the headlights, you know, those things, which, according to Mr. Robinson's testimony, he never said that he fully turned down Cheryl, and so his headlights would not have added any light anyway. But regardless, this doesn't address the distance and how quick it was. In our reply brief, I believe, we cited to a study that said at about 110 feet, a person's ability to make out a familiar face is essentially zero. This was 50 feet farther than that. It was at night. It was while Mr. Robinson was driving. And it happened in an instant while gunshots were being fired in his direction. Of course he, you know, had trouble testifying to these facts. It would have been hard for anyone to have made an identification in that instance when they're trying to focus on their self-preservation. And then for intent, the intent doesn't track here. The intent that he wanted to have Mr. Robinson killed because of, you know, financial or because of the ex-wife, anything like that, it doesn't. When you look at the facts of what happened, including the November shooting, it doesn't explain why he wouldn't have just had him shot and killed when they had a much better opportunity. But instead, they waited for him to return to the end of the block and open fire from all the way at the end of the block. You know, I think it's important to kind of look at it rationally. And in this instance, with the testimony from Mr. Robinson that there was this third party that they were worried about, that they were on alert for already, I think it's most reasonable to assume that their actions were based on trying to defend themselves against this third party and not to kill Mr. Robinson. Thank you. Any further questions? Justice Cates? No, thank you. Justice Welsh? Yes. All right. Thank you, counsel. We will take this matter under advisement and issue a ruling in due course. Thank you.